IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM A. WHITE, # 13888-084, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) Case No. 16-cv-1374-SMY |
| | ) |
| WARDEN B. TRUE, | ) |
| | ) |
| Respondent. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Petitioner William A. White is incarcerated at the United States Penitentiary in Marion, Illinois ("Marion"). He filed this habeas corpus action pursuant to 28 U.S.C. § 2241 to challenge two of his convictions in the Western District of Virginia, Case No. 08-cr-54.[1] White argues that in light of *United States v. Elonis*, – U.S. –, 135 S. Ct. 2001 (2015), he is actually innocent of Counts 1 and 5 for Interstate Transmission of a Threatening Communication (18 U.S.C. § 875(c)) because the jury was not instructed that they must find he had the subjective intent that his communication would be viewed as a threat.

Respondent counters that despite the flawed jury instructions, substantial evidence presented during White's trial established the now-required intent element, thus he cannot be "actually innocent" of the threatening communication charges. (Doc. 60, pp. 1-2). Respondent further argues that White's claim does not fit within the "savings clause" of 28 U.S.C. § 2255(e) and thus is not cognizable in a § 2241 petition. *Id.* White has replied (Doc. 62), arguing the trial

---

[1] White does not challenge his conviction on Count 3 for witness intimidation. (Doc. 6, p. 2; Doc. 60, p. 2). He was acquitted on 4 other counts.

1

court excluded evidence of specific intent, and has filed additional authority in support of his claims. (Docs. 63, 65; Doc. 77, p. 3).

This matter is now ripe for resolution. For the reasons discussed below, White's § 2241 Petition (Doc. 6) is **DENIED**.

## RELEVANT FACTS AND PROCEDURAL HISTORY

The jury found White guilty of Counts 1, 5 and 6 for threatening communications and Count 3 for witness intimidation and acquitted him of three other counts. (Doc. 60, pp. 2-3). The trial court then granted White's motion for acquittal of Count 6. *Id.* White's Petition challenges only his convictions on Counts 1 and 5.

Count 1 was based on threatening communications made in March 2007 to Jennifer Petsche, a Citibank employee who White believed was interfering with implementation of a settlement agreement over adverse credit information on White. (Doc. 60, pp. 4-5, 10); *U.S. v. White*, 670 F.3d 498, 502-03 (4th Cir. 2012) (direct appeal). White left voicemails at Petsche's work and home telephone numbers, followed by an email to her work account that included Petsche's personal identifiers and contact information. (Doc. 60, p. 10). The email stated that White had "run out of patience" with Petsche, indicated he was prepared to disclose disputed credit information about her, observed that she "often make[s] people upset" because she handles collections, and concluded, "Lord knows that drawing too much publicity and making people upset is what did in [Judge] Joan Lefkow." (Doc. 60, p. 11). The email included a hyperlink to information on the murder of Judge Lefkow's husband and mother by a disgruntled litigant who had appeared before her in court. Petsche took this communication as a direct threat to herself and her family and remained in fear for her safety for the next three years. (Doc. 60, pp. 11, 13).

2

Count 5 involved telephone calls and internet postings made by White in the fall of 2007 regarding Kathleen Kerr, a University of Delaware administrator involved in a "diversity training program" that attracted media attention. (Doc. 60, pp. 11-12); *White*, 670 F.3d at 504-05. Kerr's assistant received a telephone call from a person identifying himself as "Commander Bill White of the American White Workers' Party" who asked to speak to Kerr and recited Kerr's home telephone number and a home address (which was actually the residence of Kerr's father). When the assistant offered to take a message, the caller replied, "Yes. Just tell her that people that think the way she thinks, we hunt down and shoot." *Id.* Telephone records confirmed that a call had been placed that day from White's home to Kerr's office. After reporting the incident to police, Kerr and University staff learned that White's website, "Overthrow.com," included a post entitled "University of Delaware's Marxist Thought Reform," and listed Kerr's full name, personal identifiers and contact information, and her father's residence address mistakenly identified as Kerr's husband's address. Beneath this information were the words, "We shot Marxists sixty years ago, we can shoot them again!" The site also listed the University President's name, personal identifiers, and contact information. Another web entry called "Smash the University of Delaware" included Kerr's and the University President's personal information and the instruction, "You know what to do. Get to work!" *Id.* Kerr feared for her safety and that of her children and curtailed her family's activities following the threat. (Doc. 60, pp. 12, 14).

**Appeal and Resentencing**

White was originally sentenced to concurrent terms of 30 months on each of Counts 1, 3, and 5. The Fourth Circuit Court of Appeals affirmed the convictions, but in March 2012, remanded the case for resentencing regarding the vulnerable victim provision of USSG 3A1.1(b)(1). *White*,

670 F.3d at 515-16. Meanwhile, White had been placed on supervised release and fled to Mexico in May 2012. (Doc. 6, p. 4; Doc. 60, p. 6). During this time, he sent threatening communications to his ex-wife and to federal judges and prosecutors in Florida. He was arrested in Mexico in June 2012. His supervised release was revoked in September 2012 and he was sentenced to 10 months incarceration upon revocation. *U.S. v. White*, Case No. 08-cr-54 (W.D. Va. Doc. 310); (Doc. 6, p. 4; Doc. 60, p. 6; Doc. 60-1, pp. 29-31). On October 25, 2012, the sentencing court resentenced White to concurrent 33-month terms on Counts 1, 3, and 5 pursuant to the appellate court's remand. *U.S. v. White*, Case No. 08-cr-54 (W.D. Va. Doc. 316).

**Subsequent Sentences**

In February 2013, White was sentenced to 42 months in the Northern District of Illinois Case No. 08-cr-851 (Doc. 210) for soliciting the commission of a violent federal crime against a juror; the sentence was ordered to be served concurrently with the sentence for the case White challenges herein. (Doc. 60, p. 7; Doc. 60-2, pp. 34-39); *see also U.S. v. White*, 698 F.3d 1005 (7th Cir. 2012).

White was convicted in the Western District of Virginia, Case No. 13-cr-13 for the threats made to his ex-wife. He was sentenced on May 1, 2014 to 92 months' imprisonment, consecutive to his previous sentences. *U.S. v. White*, 810 F.3d 212 (4th Cir. 2016); (Doc. 60, p. 7; Doc. 60-1, p. 2, Doc. 60-2, pp. 40-46).

In November 2014, White was sentenced in the Middle District of Florida Case No. 13-cr-304 (Doc. 90) to 210 months for extortion by interstate communication, to be served consecutive to the 92-month sentence. (Doc. 60-1, p. 2; Doc. 60-2, pp. 47-52).

Based on the Bureau of Prisons' sentence computation, White's projected release date is

October 15, 2037. (Doc. 60-1, p. 3; Doc. 60-2, pp. 54, 58). While his 33-month sentence for Counts 1 and 5 was satisfied on April 21, 2011, the additional 10-month sentence imposed on revocation of his supervised release was aggregated with his three later-imposed sentences and therefore has not yet been satisfied, according to BOP policy. (Doc. 60-1, p. 3). Based on this computation, Respondent agrees that White is "in custody" for purposes of this habeas proceeding. (Doc. 6, pp. 6, 8; Doc. 60, p. 9).

**Previous Collateral Attacks**

White's motion challenging his sentence under 28 U.S.C. § 2255 was initially dismissed without prejudice by the Western District of Virginia in September 2012, and his re-filed § 2255 motion was denied on the merits in April 2013. (Doc. 60, pp. 7-8); Case No. 08-cr-54 (W.D. Va. Docs. 297, 299, 344). His only claim was for ineffective assistance of appellate counsel. (Doc. 6, p. 5). The Fourth Circuit denied a certificate of appealability in July 2013.

White unsuccessfully sought relief through a Writ of Coram Nobis, which the Western District of Virginia denied in March 2015 and the Fourth Circuit affirmed in June 2015. (Doc. 6, pp. 4-5; Doc. 60, pp. 7-8); Case No. 08-cr-54 (W.D. Va. Docs. 370, 371, 373). In December 2015, White sought permission from the Fourth Circuit to bring a successive § 2255 motion on the ground that *Elonis* set forth a new rule of constitutional law. (Doc. 6, p. 6). His application was rejected. *Id.*; *In Re: White*, No. 15-423 (4th Cir. 2016).

White filed his present § 2241 Petition in the Northern District of Illinois in February 2016 under Case No. 16-cv-2514; it was transferred to this Court in December 2016. (Docs. 40, 41).

## APPLICABLE LAW

Generally, petitions for writ of habeas corpus under 28 U.S.C. § 2241 may not be used to raise claims of legal error in conviction or sentencing but are instead limited to challenges regarding the execution of a sentence. *See Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998). Thus, aside from the direct appeal process, a prisoner who has been convicted in federal court is ordinarily limited to challenging his conviction and sentence by bringing a motion pursuant to 28 U.S.C. § 2255 in the court which sentenced him. *See*, *Kramer v. Olson*, 347 F.3d 214, 217 (7th Cir. 2003). A prisoner is also normally limited to only one challenge of his conviction and sentence under § 2255. He or she may not file a "second or successive" § 2255 motion unless a panel of the appropriate court of appeals certifies that such motion contains either 1) newly discovered evidence "sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense," or 2) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h).

However, under very limited circumstances, a prisoner may challenge his federal conviction or sentence under § 2241. Specifically, 28 U.S.C. § 2255(e) contains a "savings clause" which authorizes a federal prisoner to file a § 2241 petition where the remedy under § 2255 is "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). *See United States v. Prevatte*, 300 F.3d 792, 798-99 (7th Cir. 2002). The Seventh Circuit construed the savings clause in *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998): "A procedure for postconviction relief can be fairly termed inadequate when it is so configured as to deny a convicted defendant *any* opportunity for judicial rectification of so fundamental a defect in his conviction as having

been imprisoned for a nonexistent offense."[2] *See also Hill v. Werlinger*, 695 F.3d 644, 648 (7th Cir. 2012) ("'Inadequate or ineffective' means that 'a legal theory that could not have been presented under § 2255 establishes the petitioner's actual innocence.'") (quoting *Taylor v. Gilkey*, 314 F.3d 832, 835 (7th Cir. 2002)).

A petitioner must meet three conditions in order to trigger the savings clause. First, he must show that he relies on a new statutory interpretation case rather than a constitutional case. Secondly, he must show that he relies on a decision that he could not have invoked in his first § 2255 motion *and* that case must apply retroactively. Lastly, he must demonstrate that there has been a fundamental defect in his conviction or sentence that is grave enough to be deemed a miscarriage of justice. *Brown v. Caraway*, 719 F.3d 583, 586 (7th Cir. 2013). *See also Chazen v. Marske*, 938 F.3d 851, 856 (7th Cir. 2019); *Brown v. Rios*, 696 F.3d 638, 640 (7th Cir. 2012). "[T]here must be some kind of structural problem with section 2255 before section 2241 becomes available. In other words, something more than a lack of success with a section 2255 motion must exist before the savings clause is satisfied." *Webster v. Daniels*, 784 F.3d 1123, 1136 (7th Cir. 2015).

## ANALYSIS

The statute under which White was convicted in Counts 1 and 5 provides:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of

---

[2] The Seventh Circuit's interpretation of § 2255(e)'s savings clause is in line with a majority of the Circuit Courts of Appeals' jurisprudence on this issue, including the Fourth Circuit, where White was convicted. *See, e.g.*, *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *In re Dorsainvil*, 119 F.3d 245, 251 (3d Cir. 1997); *Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997); *Reyes-Requena v. United States*, 243 F.3d 893, 904 (5th Cir. 2001); *Martin v. Perez*, 319 F.3d 799 (6th Cir. 2003); *Ivy v. Pontesso*, 328 F.3d 1057, 1059-60 (9th Cir. 2003); *Abdullah v. Hedrick*, 392 F.3d 957, 960-63 (8th Cir. 2004); *see also Wright v. Spaulding*, 939 F.3d 695, 698-700 (6th Cir. Sept. 19, 2019) (collecting cases).

another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c).

At the time of White's trial and direct appeal, Fourth Circuit precedent directed that two elements must be proven for a conviction under § 875(c): (1) the defendant specifically intended to transmit the interstate communication; and (2) the communication amounted to a "true threat." *United States v. Darby,* 37 F.3d 1059, 1066 (4th Cir. 1994). Whether a communication amounts to a "true threat" was determined by an objective standard – "the interpretation of a reasonable recipient familiar with the context of the communication." *Id.* The government was not required to prove that the defendant "subjectively intended for the recipient to understand the communication as a threat." *Id.*; *see also U.S. v. White*, 670 F.3d 498, 506-12 (4th Cir. 2012). The trial court's jury instructions were consistent with these standards. (Doc. 60, p. 15-16). In other words, § 875(c) had been construed as a general intent crime rather than one requiring proof the defendant had a specific intent to threaten the person receiving his communication.

In *Elonis,* the Supreme Court altered this landscape, holding:

> The "presumption in favor of a scienter requirement should apply to *each* of the statutory elements that criminalize otherwise innocent conduct." . . . [A] defendant under Section 875(c) must know that he is transmitting a communication. But communicating *something* is not what makes the conduct "wrongful." Here "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. The mental state requirement must therefore apply to the fact that the communication contains a threat.

*Elonis v. United States*, 135 S. Ct. 2001, 2011 (2015) (quoting *U.S. v. X-Citement Video, Inc.*, 513 U.S. 64, 72-73 (1994)) (internal citations omitted). The Court continued, "There is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Elonis*, 135 S. Ct. at 2012.

8

Respondent concedes that in light of *Elonis*, the jury instruction in White's trial was defective because it omitted the subjective element which the Supreme Court's ruling requires. (Doc. 60, p. 16). He argues, however, that White cannot demonstrate that he is "actually innocent" of the § 875(c) offenses because the communications themselves, along with the testimony at trial, demonstrated that White possessed the required intent and knowledge under the *Elonis* standard. (Doc. 60, p. 18).

## Savings Clause

Turning to the three requirements of § 2255(e)'s savings clause, White has satisfied the first condition as *Elonis* is a case of statutory interpretation. *See Davenport*, 147 F.3d at 611. As to the second, White could not have invoked the 2015 *Elonis* decision in his § 2255 motion which was litigated in 2012-2013. He sought a jury instruction that would have added a subjective-intent component including some of what is now required after *Elonis*, but the trial and appellate courts rejected that attempt under the precedent at the time.[3] That precedent prevailed in the Fourth Circuit until *Elonis*, thus it would have been futile for White to have raised the issue in his § 2255 motion. *See Beason v. Marske*, 926 F.3d 932, 936 (7th Cir. 2019) (to meet the second *Davenport* condition, § 2241 petitioner must show that it "would have been futile" to raise his argument in his § 2255 motion because the "law was squarely against him."); *U.S. v. White*, 810 F.3d 212, 220-21 (4th Cir. 2016) (recognizing that *Elonis* abrogated the circuit's prior precedent, in White's direct appeal from his conviction in W.D. Va. Case No. 13-cr-13).

---

[3] White argued unsuccessfully at trial that the jury should have been instructed that to be a "true threat," the speaker must have "intended that the communication be taken as a threat that would serve to place the listener or target of the communication in fear for his or her personal safety, regardless of whether the speaker actually intended to carry out the threat." *White*, 670 F.3d at 526 n.4 (Floyd, J., concurring in part and dissenting in part).

9

The other component of *Davenport*'s second condition is that the new statutory-interpretation case must be retroactively applicable on collateral review. *See Montana v. Cross*, 829 F.3d 775, 783 (7th Cir. 2016).[4] However, the Court does not find it necessary to delve into the retroactivity issue because White fails to satisfy the third *Davenport* factor – he cannot demonstrate that his convictions resulted in a miscarriage of justice. He has not been convicted of a "nonexistent offense" nor is he "actually innocent." *See Hill*, 695 F.3d at 648; *Davenport*, 147 F.3d at 611.

**Actual Innocence**

White claims that he is actually innocent of transmitting threatening communications because of the defective jury instructions. But the instructional error alone is not determinative of his actual innocence claim. Instead, he must demonstrate that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. U.S.*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (internal quotation marks omitted).[5] Respondent argues – and the Court agrees – that the evidence at trial, which included the communications themselves and the testimony of the targets and recipients of the communications, demonstrated that White made the communications for the purpose of issuing a threat, or with knowledge that the communications would be viewed as threats, as *Elonis* requires.

---

[4] Respondent argues that *Elonis* cannot have retroactive application in the context of collateral review because the Supreme Court did not declare it to be retroactive. (Doc. 60, p. 27) (citing *Poe v. LaRiva*, 834 F.3d 770, 773 (7th Cir. 2016)). However, the Seventh Circuit has stated that "substantive decisions . . . presumptively apply retroactively on collateral review," even if the high court itself has not held a decision to be retroactive. *Chazen v. Marske*, 938 F.3d 851, 861 (7th Cir. 2019) (quoting *Holt v. U.S.*, 843 F.3d 720, 722 (7th Cir. 2016), and holding *Mathis v. U.S.*, 136 S. Ct. 2243 (2016), to be retroactive based in part on government's concession).

[5] A case White submitted as supplemental authority (Doc. 69; Doc. 77, p. 3) sets forth this standard. *Voneida v. Att'y General Pennsylvania*, 738 F. App'x 735, 738 (3d Cir. 2018) (finding *Elonis* claim is cognizable in § 2241 petition and remanding to district court to consider actual innocence claim).

(Doc. 60, pp. 18-25); *Elonis*, 135 S. Ct. at 2012.

The voice messages and email to Petsche (Count 1) were directed to and received by her. She testified that she understood them to be threats and that White's actions caused her to fear for her safety and that of her family. Before White sent the email, he had left voicemails at Petsche's work and home telephone numbers. The call to her home frightened Petsche because no customer had ever called her there. *White*, 670 F.3d at 502. White's email message included Petsche's personal identifying information, including her home address, home telephone number, three of her previous home addresses, and her husband's full name. That information alone showed that White had the ability to find her, and he emphasized this by writing, "I hope the fact that I've obviously paid someone to find you conveys the seriousness with which I take your current attitude." *Id.* White also told Petsche in the email, "drawing too much publicity and making people upset is what did in Joan Lefkow[;]" indicating that White was ready to publicize adverse information about Petsche if she did not meet his demand regarding the Citibank settlement. The email included a link to information about the murder of Judge Lefkow's family members. *Id.*

The content of this email to Petsche alone demonstrates White's subjective intent to communicate a threat and shows that he acted with knowledge that his message would be perceived as a threat. His words, coupled with Petsche's testimony about the effect of reading the email and information about the attack on Judge Lefkow's family, would lead any factfinder to reasonably conclude that the sender intended to make a threat and knew the statements would be viewed as a threat by the recipient. Petsche's paralegal and Citibank security staff also took the email as a threat. *Id.* No rational juror hearing this proof could find that White lacked the intent to threaten Petche or that he had no knowledge Petche would view his message as a threat. White's arguments fail to meet the *Bousley* standard for actual innocence as well; he cannot show that "it is more

likely than not that no reasonable juror would have convicted him" if the jury had been instructed that they must find a subjective intent to threaten in order to convict White. *See Bousley*, 523 U.S. at 623; *Schlup*, 513 U.S. at 327-28.

The evidence leads to the same conclusion with respect to Count 5. White telephoned Kerr's office at the University of Delaware and asked to speak to Kerr.[6] *White*, 670 F.3d at 504. When Kerr's assistant (Bedgar) told White she was not in, he responded that he knew Kerr was there because he had just spoken to her husband. He then recited Kerr's home telephone number and a residential address, which Bedgar recognized as the address of Kerr's father. *Id.* Bedgar offered to take a message and White responded, "Just tell her that people that think the way she thinks, we hunt down and shoot." *Id.* Upon learning of the call, Kerr broke down into tears out of concern for her safety and that of her family. Bedgar and other university staff understood the call as "a very serious threat" and called police. *Id.* They soon learned about posts on White's website, "Overthrow.com," listing Kerr's full name, telephone number, and other personal identifying information, along with the words, "We shot Marxists sixty years ago, we can shoot them again!" and, "You know what to do. Get to work!" *Id.*

Under the pre-*Elonis* standards, the jury found that White specifically intended to transmit the communications and that the communications were "true threats" because they would be interpreted as such by a "reasonable recipient familiar with the context of the communications." *White*, 670 F.3d at 506. Even if the jury had been instructed that they must also find White made the statements in his telephone call either for the purpose of issuing a threat to Kerr or with knowledge that his words would be viewed as a threat, the statements themselves provided ample evidence of the mental state required for a conviction under the *Elonis* standard.

---

[6] White denied at trial that he was the caller, but the caller's self-identification as "Bill White" and telephone records supported the jury's finding that he indeed made the call. *White*, 670 F.3d at 504.

12

White instructed Bedgar to tell Kerr "we hunt down and shoot" people who think the way she thinks. *White*, 670 F.3d at 504. Such a statement, delivered by White in what Bedgar described as a "cold" and "dead sounding" tone of voice, demonstrates a subjective intent to issue a threat. White's internet postings similarly reflect an intent to threaten and/or the knowledge that the statements, "we can shoot [Marxists] again" and "You know what to do. Get to work!" associated with Kerr's contact information would be viewed as threatening. *Id.* White fails to establish that "it is more likely than not that no reasonable juror would have convicted him" if the jury had been properly instructed.[7] *See Bousley*, 523 U.S. at 623. As such, his conviction cannot be considered a "miscarriage of justice" so as to satisfy the narrow requirements of § 2255(e)'s savings clause, and no relief is available to him under § 2241.

## Harmless Error

Even though the instructions to White's jury were erroneous in light of the Supreme Court's later *Elonis* opinion, the error was harmless. Decisions of the Supreme Court, the Seventh Circuit, and the Fourth Circuit all establish the vitality of harmless-error analysis as applied to faulty jury instructions, despite White's assertion to the contrary. (Doc. 6, p. 10). *See Neder v. United States*, 527 U.S. 1, 9 (1999); *Pope v. Illinois,* 481 U.S. 497 (1987); *U.S. v. White*, 810 F.3d 212, 221-22 (4th Cir. 2016);[8] *U.S. v. Natale*, 719 F.3d 719 (7th Cir. 2013); *Lanier v. U.S.*, 220

---

[7] White submitted a copy of the Government's motion in limine to exclude evidence at trial of his subjective intent to threaten and/or mental state, in an apparent attempt to show that no such evidence was presented. (Doc. 62, pp. 1-2; Doc. 58, pp. 4-9). He does not indicate how the trial court ruled on the motion. It is true that under precedent at the time, subjective intent was not an element to be proven for a finding of guilt. Regardless, the record reflects that White put on no evidence whatsoever at his trial; moreover, he does not argue here that he would have testified or put on other evidence if the Government's motion had been denied. *See U.S. v. White*, No. 08-cr-54 (W.D. Va., Docs. 130, 133, 136).

[8] The Fourth Circuit's decision in White's direct appeal from his conviction for interstate transmission of threats to his ex-wife is particularly instructive here. White raised the same issue as in the instant case – the pre-*Elonis* omission of a jury instruction on subjective intent. The Fourth Circuit found the omission

F.3d 833, 837-40 (7th Cir. 2000). Thus, an instructional error is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *Neder*, 527 U.S. at 18; *Lanier*, 220 F.3d at 839. As previously discussed, the evidence at trial clearly established the subjective intent element required under *Elonis*, and no rational jury would have reached a contrary result if the omitted subjective-intent element had been included in the instructions.[9]

## CONCLUSION

For the foregoing reasons, William A. White's Petition for habeas corpus relief under 28 U.S.C. § 2241 (Doc. 6) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

It is not necessary for Petitioner to obtain a certificate of appealability from this disposition of his § 2241 petition. *Walker v. O'Brien*, 216 F.3d 626, 638 (7th Cir. 2000). If Petitioner wishes to appeal the dismissal of this action, his notice of appeal must be filed with this Court within 60 days of the entry of judgment. FED. R. APP. P. 4(a)(1(A). A motion for leave to appeal *in forma pauperis* ("IFP") must set forth the issues Petitioner plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If Petitioner does choose to appeal and is allowed to proceed IFP, he will be liable for a portion of the $505.00 appellate filing fee (the amount to be determined based on his prison

---

of that instruction to be harmless error in light of the content of White's email communications, which no rational jury could find he did not intend as a threat or know it would be received as such. *White*, 810 F.3d 212, 221-22 (4th Cir. 2016).

[9] Authority offered by White from another jurisdiction does not persuade the Court to reach a different result (Doc. 65). While the Eastern District of Tennessee vacated a § 2255 movant's conviction in *U.S. v. Jeffries*, No. 10-cr-100, 2018 WL 910669 (Feb. 15, 2018) after *Elonis*, the character of the evidence against the defendant there was quite different from White's case – Jeffries posted a threatening video on his own Facebook page, but never issued any communications directly to the targeted person, as did White. The record in White's case includes evidence regarding his subjective intent, while no such evidence existed in the record in *Jeffries.*, Doc. 77, p. 3.

14

trust fund account records for the past six months) irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998).

A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 60-day appeal deadline. FED. R. APP. P. 4(a)(4). A Rule 59(e) motion must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended. Other motions, including a Rule 60 motion for relief from a final judgment, do not toll the deadline for an appeal.

**IT IS SO ORDERED.**

**DATED: January 30, 2020**

*s/ Staci M. Yandle*
**STACI M. YANDLE**
**United States District Judge**